UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Cause No. 1:20-CR-25-HAB |
| ) | |
| PAUL CARTER ) | |

**OPINION AND ORDER**

Defendant received a lengthy prison sentence for his role in an armed bank robbery. But late last year, he suffered a debilitating stroke. He now moves for compassionate release. (ECF No. 141). That motion is now fully briefed (ECF Nos. 149, 156, 157) and ready for ruling.

**I.    Factual and Procedural Background**

**A.    *Offense Conduct***

In March 2020, Defendant entered a credit union in Fort Wayne, Indiana, armed with a handgun. He displayed the handgun to the teller, demanding money. The teller complied, and Defendant put the money in a bag before exiting the credit union. A surveillance camera on a nearby business captured Defendant leaving the credit union, running down a nearby alley, and getting into a minivan.

Five minutes later, police officers initiated a traffic stop on a minivan near the credit union. The minivan took off, leading the officers on a short pursuit. Officers observed the occupants of the minivan throwing money out of the windows during the pursuit. The minivan eventually stopped, with both occupants fleeing on foot.

The driver of the minivan, Roland Ellington, was quickly taken into custody. Defendant managed to evade the officers only slightly longer and was taken into custody after being found in a nearby backyard. A search of the nearby area uncovered a bag containing the clothes worn by

the credit union robber and $975. A handgun was found along the path of Defendant's flight, only 50 feet from where he was apprehended.

In December 2020, Defendant pleaded guilty to an Information charging him with armed robbery, in violation of 18 U.S.C. § 2113(a) and (d), and possessing, using, and brandishing a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c). He received a sentence of 141 months' imprisonment, including a statutory mandatory minimum seven years on the firearm count. That sentence was later reduced to 130 months' imprisonment after Defendant moved for relief under Amendment 821. Defendant is housed at Hazelton USP, with a projected release date of June 6, 2029.

**B.**    *Defendant's Medical Condition*

In October 2024, medical staff at Hazelton USP were called to Defendant's cell. They found Defendant lying, unresponsive, on the floor. He was taken to the medical ward where he was assessed. Finding no obvious reason for Defendant's condition, medical staff concluded that Defendant had ingested an unknown drug. Defendant was not treated for the suspected overdose, but was returned to his cell.

Twenty hours later, Defendant was brought back to the medical ward on a gurney. Medical staff noted that his condition had not improved since the day before and referred him to a nearby hospital. The hospital apparently knew immediately that Defendant had suffered a stroke, as the "stroke team" was present when Defendant arrived at the emergency room. A brain CT confirmed the stroke, and Defendant underwent brain surgery to remove blot clots in his brain. Later tests showed significant brain damage.

Because of the brain damage, Defendant now suffers expressive and receptive aphasia—he struggles to both speak and understand speech. A speech pathologist at a long-term care hospital

where Defendant was temporarily housed suggested Defendant receive "daily treatment" in cognitive communication, language, voice, oral health, and swallowing. Defendant was also recommended for a special diet to address his nutritional needs, and it was further recommended that Defendant be assisted and monitored while eating because of his difficulty swallowing.

Defendant was transferred back to Hazelton USP in December 2024. The Clinical Director at the prison reports that Defendant's prognosis is "fair, at best, and . . . it does not appear he will return to pre-stroke physical or intellectual function." The Clinical Director also reports that Defendant continues to suffer from "pretty severe receptive and expressive aphasia," and "continues to rely on single word affirmative responses." Even so, Defendant was discharged from occupational, physical, and speech therapy. These discharges leave Defendant at a BOP Care Level 2, and Hazelton USP is a Care Level 2 facility.

Although Defendant was discharged from all therapies, there is little doubt he still struggles with significant aphasia. Defendant has submitted a recording of a conversation between Defendant and a member of his counsel's staff, recorded in January 2025. His speech and intellectual deficits are clear in that recording.

**II.     Legal Analysis**

Generally, a court is statutorily prohibited from modifying a term of imprisonment once imposed. *See* 18 U.S.C. § 3582(c). A handful of statutory exceptions exist, however, one of which allows a court to grant an inmate compassionate release if the inmate meets certain requirements. *See* 18 U.S.C. § 3582(c)(1)(A). Under this provision, a court may not modify a term of imprisonment except that –

> (1) in any case --
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to

> appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, . . . finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction …
>
> … and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i).

Because Defendant, not the Director of the BOP, filed the motion, Defendant must first show that he has satisfied the statutory exhaustion requirement. The Government concedes that Defendant has properly exhausted his remedies. (ECF No. 156 at 2).

**A.**     ***Extraordinary and Compelling Reasons***

Congress did not define "extraordinary and compelling reasons" in the statute, instead delegating the matter to the Sentencing Commission to promulgate a policy statement that "describe[s] what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). The policy statement, contained in United States Sentencing Guidelines ("U.S.S.G.") § 1B1.13 and the accompanying Application Notes, in line with the statutory directive in § 3582(c)(1)(A), requires a court to make several findings.

First, the court must address whether "[e]xtraordinary and compelling reasons warrant the reduction" and whether the reduction is otherwise "consistent with this policy statement." U.S.S.G. § 1B1.13(1)(A), (3). To this end, a court is to consider the medical condition of the defendant, his age, his family circumstances, and whether there exists in the defendant's case an extraordinary or compelling reason "other than or in combination with" the other reasons described in the Application Notes. Second, the Court must determine whether Defendant is "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. §

4

1B1.13(2). Finally, the Court must consider the § 3553(a) factors, "to the extent they are applicable." U.S.S.G. § 1B1.13.

Defendant moves for relief under § 1B1.13(b)(1)(B). That section allows for compassionate release where an individual is "suffering from a serious physical or medical condition," or "suffering from a serious functional or cognitive impairment," "that substantially diminishes the ability of the defendant to provide self-care within the environment or a correctional facility and from which he or she is not expected to recover." Defendant asserts that his documented mental, physical, and functional deficits meet this definition, thereby demonstrating that extraordinary and compelling reasons exist for his release.

The Government half-heartedly objects to this conclusion. The Government seemingly concedes, as it should, that Defendant suffers from serious functional and cognitive impairment from which he is not expected to recover. But it argues there is no evidence that his impairment "*substantially* diminish[es] his ability to provide self-care inside the prison." (ECF No. 156 at 15) (original emphasis). The Government relies on the therapy discharges, and notes that the BOP "has not been advised that [Defendant] is having any problems with daily functioning inside Hazelton." (*Id*.).

The Court struggles to reach the same conclusion. Every non-BOP record given to the Court shows that Defendant suffers significant deficits. He has, in the words of the BOP's own Clinical Director "pretty severe" struggles in speaking and understanding speech. He struggles to swallow to the point that supervision and assistance with eating was prescribed. Daily therapies were prescribed to address these deficits. Whether the BOP has been "advised" or not, the Court cannot imagine a set of circumstances where Defendant does not suffer "substantial" difficulties in his ability to provide self-care in the correctional environment.

5

And nothing about the BOP's response to Defendant's condition to date fills the Court with confidence that the BOP is accurately describing Defendant's condition now or can treat Defendant's condition in the future. As Defendant notes, the BOP's inaction likely exacerbated the damage from the stroke—the connection between delay in treatment for a stroke and diminished outcomes is well-documented. The BOP failed to treat Defendant's stroke for at least 24 hours while it labored under the unsupported, and unaddressed, belief that he was suffering a drug overdose. The Court is not a doctor, but it is no reach to believe that Defendant's prognosis would be better if he had received prompt stroke treatment.

The Court is also concerned about the treatment, or lack thereof, that Defendant has received since returning to the BOP. Defendant's discharge from all forms of therapy is hard to reconcile with the Clinical Director's observations or the prescription for "daily" treatment he received when he left the hospital. That the discharges are supported by little, if any, documents or medical reports is troubling. If Defendant will recover, now is the time that improvement must occur. The BOP's disinterest in that recovery argues strongly in Defendant's favor.

Taken as a whole, the evidence proves conclusively that Defendant suffers from "a serious functional or cognitive impairment," "that substantially diminishes the ability of the defendant to provide self-care within the environment or a correctional facility and from which he . . . is not expected to recover." He has, then, shown an extraordinary and compelling reason for release. The Court will now turn, as it must to the § 3553(a) factors.

**B.** *§ 3553(a)*

It is here that the Government makes its stand. Noting Defendant's extensive criminal history, it argues that Defendant has a "clear penchant for violence and firearms" that should disqualify him for compassionate release. (ECF No. 156 at 15).

The Government's position finds ample support in Defendant's presentence investigation report. Defendant's adult criminal history extends back 30 years. That history includes convictions for domestic battery, multiple instances of illegal possession of a firearm, and armed robbery. And Defendant's crimes became more serious as he aged, culminating in the instant armed bank robbery. The "history and characteristics" of Defendant, 18 U.S.C. § 3553(a)(1), seemingly weigh against release.

But the nature of Defendant's condition raises a question: how much of that person still exists? If, as the medical records suggest, Defendant suffered significant brain damage, does his criminal thinking persist? Is he still prone to respond to desperate times with crimes and violence? The answer to these questions is unclear, muddying the usually straight-forward application of a problematic criminal history.

The Court also notes that Defendant has not served a significant part of his sentence. Defendant has served less than five years. This doesn't even cover the statutory mandatory minimum for the firearm count. One could argue, then, that release would not reflect the seriousness of Defendant's offense, promote respect for the law, or provide just punishment for the offense.

All that said, the Court finds that Defendant's current condition outweighs its concerns over Defendant's criminal past. Given Defendant's broad aphasia, it is hard to imagine that Defendant would, or even could, resume criminal conduct if released. There is little concern about protecting the public from further crimes of Defendant. And Defendant clearly needs medical care, care he is seemingly not receiving in the BOP. Weighing all § 3553(a) factors, the Court concludes that relief is appropriate.

### III.     Conclusion

For these reasons, Defendant's request for compassionate release (ECF No. 141) is GRANTED. The Court ORDERS the balance of Defendant's previously imposed sentence of 130 months' imprisonment be served on supervised release.

This order is stayed for up to fourteen days, for the verification of Defendant's residence and/or establishment of a release plan, to make appropriate travel arrangements, and to ensure his safe release. Defendant shall be released as soon as a residence is verified, a release plan is established, appropriate travel arrangements are made, and it is safe for the defendant to travel. There shall be no delay in ensuring travel arrangements are made. If more than fourteen days are needed to make appropriate travel arrangements and ensure his safe release, the parties shall immediately notify the court and show cause why the stay should be extended.

Defendant's previously imposed term of supervised release and conditions of supervised release are unchanged, except that the Court adds a condition of home confinement and GPS monitoring.

SO ORDERED on January 22, 2025.

    s/ *Holly A. Brady*
    CHIEF JUDGE HOLLY A. BRADY
    UNITED STATES DISTRICT JUDGE